Jacob M. Polakoff, Bar No. 035832006
jpolakoff@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel. 215.875.3000
Fax 215.875.4604

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK DIVISION

| | | |
|---|---|---|
| TYLER ROBERT PANG, | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2:19-cv-13874 |
| | ) | |
| v. | ) | **<u>JURY TRIAL DEMANDED</u>** |
| | ) | |
| TRANS UNION, LLC, and | ) | |
| CORELOGIC CREDCO, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Tyler Robert Pang ("Plaintiff" or "Mr. Pang"), who resides at 10 Judson Drive., Middlesex, New Jersey 08846, is a living, breathing, 29 year-old consumer, brings this Complaint against Trans Union, LLC ("Trans Union") whose principal place of business is located at 555 West Adams Street., Chicago, Illinois 60661 and CoreLogic Credco, LLC ("CoreLogic") whose principal place of business is located at 10277 Scripps Ranch Blvd., San Diego, California 92131 (collectively, "Defendants"), states as follows:

### <u>INTRODUCTION</u>

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant Trans Union acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring service to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable

procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

3

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

10.    This action seeks actual, statutory, and punitive damages, costs and attorneys' fees for Mr. Pang against Defendants Trans Union and CoreLogic for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

11.    Plaintiff Tyler Robert Pang ("Plaintiff" or "Mr. Pang") is a natural person who resides in the City of Middlesex, State of New Jersey, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

12.    Defendant Trans Union, LLC ("Trans Union") is a foreign limited liability company that does business throughout the country and regularly conducts business in the State of New Jersey.

13.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

14.    Defendant CoreLogic Credco, LLC is a foreign limited liability company that does business throughout the country and regularly conducts business in the State of New Jersey.

15.    CoreLogic is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f).  is regularly engaged in the business of assembling, evaluating, and disseminating information

concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

16.     CoreLogic is also a "reseller" as defined at 15 U.S.C. § 1681a(u), which is a "consumer reporting agency that—(1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced."

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Defendants' Practices Concerning the Sale of Reports on the "Deceased"

19.     Defendant Trans Union sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

20.     Defendant CoreLogic sells or resells consumer reports (often called "credit report" or "reports" or "tri-merge reports") and credit scores to various markets, including but not limited to the mortgage financing and lending industry.

21.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

22.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

23.    Defendants routinely place a "deceased" notation or marking on reports when they are advised by any of their many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

24.    Defendants' furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

25.    Defendants do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

26.    Defendants do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

27.    Defendants do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

28.    In some cases, in order to assure accuracy, Defendants may send letters and/or other communications to consumers when certain information that may be considered suspicious or

6

unreliable is furnished about said consumers to be placed in their Trans Union or CoreLogic credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Neither Defendant has any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to Defendants to be placed in said consumer's credit file or report.

29.     Defendants regularly receive the "Death Master File" from the Social Security Administration, listing by social security number those consumers that the government believes to be deceased. But Defendants do not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

30.     Defendants will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

31.     Neither of the Defendants employ any procedures *at all* to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

32.     Even in instances where other data on the face of the consumer's report indicate that he/she is not deceased, Defendants employ no procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

33.     Even in instances where the purportedly deceased consumer communicates directly with Defendants, Defendants employ no procedures to assure that a consumer with a "deceased"

mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

34. Once a "deceased" mark is placed upon a consumer's report, Defendant Trans Union will not calculate and will not provide a credit score for that consumer.

35. Upon Defendant Trans Union's reports with a "deceased" mark sold to third parties, Defendant Trans Union never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

36. Defendants know that third party credit issuers require a credit score in order to process a given credit application.

37. Defendants know that consumers without credit scores are unable to secure any credit from most credit issuers.

38. Defendants know that living consumers are routinely turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

39. Defendants have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendants are reporting them as "deceased" and without a credit score.

40. Defendants have received and documented many disputes from consumers complaining that their Trans Union and CoreLogic credit report had them erroneously marked as "deceased."

41. Defendants know that thousands of consumers are erroneously marked as "deceased" on their Trans Union and CoreLogic credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

42.      Nevertheless, both Defendants employ no procedures to assure that a consumer marked as "deceased" on one or both of Defendants' reports is, in fact, deceased.

43.      Even consumers who dispute the erroneous "deceased" status on their Trans Union and CoreLogic credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

44.      Defendants have no independent procedure to change an erroneous deceased status on their own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

45.      Nor do Defendants employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

46.      For years after a consumer's actual death, Defendants will continue to sell credit reports about that consumer.

47.      Defendants will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

48.      Defendants charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

49.      Defendants profit from the sale of reports on deceased consumers.

50.      Defendants have in their respective credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

51.      Defendants know that truly deceased consumers do not apply for credit.

52.     Defendants know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Trans Union and CoreLogic to be a common and major source of identity theft.

53.     Defendants know that identity theft and credit fraud are serious and widespread problems in our society.

54.     Defendants warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

55.     Defendants have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

56.     Defendants sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

57.     For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants to sell their credit reports, absent a court order.

58.     Defendants know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Mr. Pang Attempts to Obtain Credit for a Vehicle Purchase in September 2017**

59.    In or about September 2017, Mr. Pang attempted to obtain financing through Scott Federal Credit Union ("SFCU") in New Jersey to purchase a 2014 Jeep Patriot.

60.    Mr. Pang was excited to make his first vehicle purchase but his excitement was suddenly and unexpectedly stymied when the loan officer mentioned that there was a "problem" with Mr. Pang's credit.

61.    Mr. Pang takes great pride in his good name and established credit rating, so he works hard to ensure that his bills are paid in-full and on-time every month. He believes and understands that his credit record with all of his creditors is excellent, so Mr. Pang could not imagine what the problem could be.

62.    Much to Mr. Pang's shock and dismay, his financing was halted by SFCU because Mr. Pang's Trans Union credit report indicated that he was "deceased" and had no credit score.

63.    While confused about how such a mistake could happen, and also fearful of what it meant to his ultimate ability to secure financing for his vehicle or future purchases, Mr. Pang genuinely believed that such an obvious error would have to be fairly easily corrected. He kept his fingers crossed that after providing whatever proof SFCU needed to override this mistake he could proceed with obtaining financing for his vehicle purchase.

64.    Accordingly, Mr. Pang provided copies of his current driver's license and his Social Security card in an effort to prove that he was, in fact, alive. Nevertheless, SFCU advised that it could not approve him for financing because of the "deceased" notation on his Trans Union credit report.

**Mr. Pang's First Telephonic Dispute with Trans Union in October 2017**

65.    In or around October 2017, still frustrated that SFCU had denied him credit because of his Trans Union credit report, Mr. Pang telephoned Trans Union and spoke to a representative.

Mr. Pang explained his issue in great detail and informed the representative that Trans Union had been reporting him as "deceased" on his credit report for years now and that he was recently denied credit as a result. Mr. Pang stated that he was disputing the "deceased" notation on his Trans Union credit report and asked that it be corrected as soon as possible.

66.     Trans Union failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Mr. Pang.

67.     Trans Union failed to heed Mr. Pang's actual notice of the erroneous "deceased" notation and continued to report him as deceased.

68.     Mr. Pang never heard back from Trans Union.

**Mr. Pang's Second Telephonic Dispute with Trans Union in January 2018**

69.     In or about January, 2018, having not heard back from Trans Union and still frustrated that SFCU had denied him credit because of his Trans Union credit report, Mr. Pang telephoned Trans Union and spoke to a representative. Mr. Pang explained his issue in great detail and informed the representative that Trans Union had been reporting him as "deceased" on his credit report for years now and that he was recently denied credit as a result. Mr. Pang stated that he was disputing the "deceased" notation on his Trans Union credit report and asked that it be corrected as soon as possible.

**Trans Union's Response to Mr. Pang's January 2018 Dispute**

70.     In or about February 2018, Mr. Pang received mail correspondence from Trans Union, which contained a one-page solicitation for Trans Union's credit monitoring products.

71.     Trans Union failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Mr. Pang.

72.     Trans Union failed to heed Mr. Pang's actual notice of the erroneous "deceased" notation and continued to report him as deceased.

### Mr. and Mrs. Pang Begin Their Home Search in September 2018

73.     In or about September 2018, Mr. Pang and his wife, Megan Pang ("Mrs. Pang") began looking to purchase a home in the greater Middlesex, New Jersey area.

74.     In early January 2019, Mr. and Mrs. Pang began working with a realtor and found their dream home for sale in Manville, New Jersey ("the Manville property").

75.     While the Manville property was originally listed for sale at $214,900.00, they were able to negotiate the price down to $207,000.00

76.     However, Mr. Pang was paranoid and very nervous that Trans Union's previous failure to correct the "deceased" notation on his Trans Union credit report might prevent him from obtaining financing for the Manville property. Mr. Pang was determined to try and resolve this issue once and for all. Thus, in hopes of preventing yet another credit denial, Mr. Pang decided to be proactive and draft and send a second written dispute to Trans Union, attaching numerous documents to establish that he was, in fact, alive.

### Mr. Pang's First Written Dispute with Trans Union in January 2019

77.     On January 17, 2019, Mr. Pang mailed a written dispute to Trans Union, disputing the "deceased" notation appearing on his credit reports. Mr. Pang's dispute specifically stated the following:

In attempting to obtain credit reports, loans, and credit cards over the last 5 to 6 years, I have run into a "Deceased" notice from your company. Experian and Equifax both have me correctly listed as a living individual.

After contacting your customer service line, it appears the issue is a mismatch. Please review the enclosed documents and dive into my account for me. It is a bit of nonsense to be told you are deceased but do understand how such an issue arises. I do hope you can fix the information without much issue.

I formally request that you rectify the information in your files to reflect the proper identification for Tyler R. Pang.

Warm Regards,

Tyler Robert Pang

623.734.3887

P.S. Feel free to contact me regarding this request.

Enclosed: Copies of: Cancelled Check (1), Drivers License (1), Social Security Card (1)

### Trans Union's Response to Mr. Pang's January 2019 Dispute

78. Trans Union failed to reinvestigate and respond to Mr. Pang's January 17, 2019 dispute.

79. Trans Union failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Mr. Pang.

80. Trans Union failed to heed Mr. Pang's actual notice of the erroneous "deceased" notation and continued to report him as deceased.

81. After 30 days had passed and he had not received any correspondence from Trans Union, Mr. Pang telephoned Trans Union and spoke with a representative. The representative stated that Trans Union never received his dispute.

### Mr. Pang's First Attempt to Obtain Credit for a Mortgage Loan in January 2019

82.     In or around late January 2019, Mr. and Mrs. Pang began working with Bob McCabe ("Mr. McCabe"), a Mortgage Loan Originator at AnnieMac Home Mortgage ("AnnieMac") in Mount Laurel, New Jersey to obtain financing for a home mortgage loan on the Manville property.

83.     In or around late January 2019, Mr. and Mrs. Pang applied for a mortgage loan with AnnieMac.

84.     Mr. and Mrs. Pang were ecstatic. They had been living in Mrs. Pang's parents' basement for over two years saving their hard-earned money for this very moment. They had found their dream home, the process of securing financing was underway, and they could now endeavor to start their family.

85.     On February 5, 2019, Mr. Pang received correspondence titled Letter of Explanation stating, among other things, that copies of his Equifax, Experian, and Trans Union credit reports were provided to AnnieMac by CoreLogic Credco, which is both a repository and reseller of credit data provided by the national credit bureaus.

86.     CoreLogic sells or resells consumer reports (often called "credit report" or "reports" or "tri-merge reports") and credit scores to various markets, including but not limited to the mortgage financing and lending industry.

87.     In or around January or early February 2019, CoreLogic purchased Mr. Pang's credit file from Experian, Equifax, and Trans Union.

88.     Both Experian and Equifax provided CoreLogic with a credit score for Mr. Pang while Trans Union reported no credit score for Mr. Pang, stating that his credit file was not scored because he was deceased.

15

89.     In or around January or early February 2019, CoreLogic assembled and merged the credit information regarding Mr. Pang, which it purchased from Experian, Equifax, and Trans Union, into a tri-merge report and sold it to AnnieMac.

90.     The tri-merge report that CoreLogic sold to AnnieMac was patently inconsistent—it contained Mr. Pang's Experian and Equifax credit scores but did not contain a credit score from Trans Union and, instead, stated that his credit file was not scored because he was deceased.

91.     Mr. Pang was excited to make his first home purchase but his excitement was suddenly and unexpectedly stymied when he received a telephone call from Mr. McCabe at AnnieMac stating that there was a "problem" with his credit.

92.     Mr. Pang takes great pride in his good name and established credit rating, so he works hard to ensure that his bills are paid in-full and on-time every month. He believes and understands that his credit record with all of his creditors is excellent, so Mr. Pang could not imagine what the problem could be now.

93.     Much to Mr. Pang's shock and dismay, his financing was halted by AnnieMac because Mr. Pang's Trans Union credit report indicated that he was "deceased" and had no credit score.

94.     Mr. Pang immediately explained to Mr. McCabe that Trans Union's "deceased" notation had been a continuing problem for many years now and that he had recently sent a very detailed written dispute with supporting documentation to Trans Union on January 17, 2019. Mr. Pang pleaded with Mr. McCabe to be patient with him while he waited for Trans Union to reinvestigate his dispute and delete the "deceased" notation from his Trans Union credit report. Mr. Pang promised Mr. McCabe that he would get back to him by February 18, 2019 with an update because Trans Union only had until February 17, 2019 to complete its reinvestigation.

16

95.     On February 14, 2019, Mr. and Mrs. Pang received an email message from Ginger Destree ("Ms. Destree"), Processing Team Lead at AnnieMac, recommending that they contact CoreLogic to try and correct the issue on Mr. Pang's Trans Union credit report. Ms. Destree reiterated that correcting this issue was "very important so please do this as soon as possible."

96.     On February 17, 2019, Mr. Pang responded to Ms. Destree's email and stated:

I had not tried calling corelogic before today. Rather, I have been attempting to rectify my TransUnion credit status via their personnel. I'll call Corelogic during business hours tomorrow in the hopes they are better to deal with than TU.

97.     On February 18, 2019, Ms. Destree sent Mr. Pang another follow-up email asking what information, if any, he had received from Trans Union.

98.     On February 18, 2019, Mr. Pang responded to Ms. Destree's email and stated:

TransUnion is a messy maze of folks who don't speak English as a first language, but through the transfers I occasionally get someone on the phone who seems to know what's going on. From what I've gathered, a gentleman passed away in the mid 2000's, and when TransUnion noted his death, they accidentally typed my SSN as his. I was told to send a copy of my Social and a W2 to a PO Box in Chester, PA and to follow up in 30 days. When I did so, I was told that nothing had been received and that I would need a form from the Social Security Administration as well as the Social and W2, and send that to the same PO Box. The letter from SSA ought to be arriving shortly, and I will resend everything once I get that. It still seems I'm at least 45 days from anything changing on their end.

99.     On February 18, 2019, Ms. Destree responded to Mr. Pang's email and stated:

Oh wow, that is some obstacle you have to go through.. just keep me posted as we cannot close on this purchase until that is taken care of.

100.    On February 19, 2019, Mr. McCabe sent Mr. Pang another follow-up email and stated:

As discussed, please contact Credco. The reason I prefer Credco is that we purchase thousands of credit reports through this company. They help us in many ways to repair credit, update reports and correct problems. They will speed up the correction process.

Please call 80-523-0233.

Let them know Annie Mac Home Mortgage asked you to call.
Tell them you have a reference number – 11306692831000.
Tell them that Trans Union has reported an error.

I would call for you but Credco will only discuss with the borrower. Please report
back the results. We cannot wait for Trans Union.

101.    Meanwhile, Mr. and Mrs. Pang's mortgage loan approval had been scheduled on

or about March 6, 2019.

102.    Mr. and Mrs. Pang's closing for the Manville property was scheduled for March

14, 2019.

103.    Shortly thereafter, Mr. and Mrs. Pang were forced to advise the seller that their

mortgage financing had hit a snag and the house could not close as previously scheduled.

104.    On March 14, 2019, as neither CoreLogic nor Trans Union had corrected the

"deceased" notation on Mr. Pang's credit report, the seller's agent contacted AnnieMac and

notified Mr. McCabe that the seller was backing out of the deal.

105.    Upon receiving this news, Mr. and Mrs. Pang were devastated.

**Trans Union Adds a Fraud Alert to Mr. Pang's Credit Report**

106.    On or about March 15, 2019, Mr. Pang received mail correspondence from Trans

Union stating, among other things, that it had added a fraud alert to his Trans Union credit report

and that it would remain on his credit report for one year.

**Mr. Pang's Second Written Dispute with Trans Union in March 2019**

107.    Determined not to lose out on his dream home, Mr. Pang decided to write and send

a third dispute letter to Trans Union pleading with it to correct the erroneous "deceased" status.

108.    On March 21, 2019, Mr. Pang mailed a written dispute to Trans Union, disputing

the "deceased" notation appearing on his credit reports. Mr. Pang's dispute specifically stated the

following:

I have run into a "Deceased" notice from your company. Experian and Equifax both have me correctly listed as a living individual, and this request is that you do the same. In speaking to Sandra, Candace, and March in your fraud division, I am providing the proper documentation to remove the "High Risk Alert" on my file. According to your employees, you require this cover letter, Social Security Form 2458, and a copy of my Social Security Card. I am further including a copy of my college diploma, marriage license, drivers license, a cancelled check from my current account, and 2018 W2 to additionally prove my status.

REASON FOR MAILING:

The high risk alert on my file should be removed. I am alive, well, and able to pay my creditors. I am currently attempting to close on a mortgage, and need this process expedited.

I formally dispute my status as deceased and high risk and request that you rectify the information in your files to reflect the proper information for Tyler R. Pang.

Any undue delay will not be tolerated, nor will it be lawful if it extends beyond 30 days.

Sincerely,

Tyler Robert Pang

623.734.3887

P.S. Feel free to contact me regarding this request.

Enclosed: Copies of: Cancelled Check (1), Drivers License (1), Social Security Card (1), Marriage License (1), Diploma (1), W2 (1)

109. On March 29, 2019 at 11:44 A.M., Mr. Pang's written dispute was delivered to Trans Union.

110. Trans Union failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Mr. Pang.

111.    Trans Union failed to heed Mr. Pang's actual notice of the erroneous "deceased" notation and continued to report him as deceased.

### Mr. and Mrs. Pang's Real Estate Attorney Tries to Save the Mortgage Loan

112.    On March 25, 2019, Mr. Pang's real estate attorney, Edward Johnson, Jr. ("Mr. Johnson") sent the following mail correspondence to the seller's real estate attorney, Richard Tice ("Mr. Tice"), attempting to save the Manville mortgage contract despite Trans Union's failure to correct its "deceased" notation on Mr. Pang's credit report:

Dear Mr. Tice,

Receipt is acknowledged of your letter terminating the contract because of the inability of my clients to obtain their mortgage approval within the time frame set forth in the contract. My clients think that they may be able to clear up the identity problem with the credit union within the next 10 days or sooner and, once that is done, they should be able to obtain their loan approval. The problem is that one of the credit agencies has listed my client as "deceased" and he has the burden of proving that their records are incorrect.

Since I already have my title search completed, I would be able to close shortly after my clients obtain their mortgage approval so would you consider letting the contract continue with your client having the right to show the property and to enter into another contract if a buyer is produced but with my clients being allowed to continue with the contract once they are able to obtain their mortgage financing if no new buyer has been found in that interim period?

My clients are really desirous of being able to proceed with the purchase of this property and the only reason they have not been able to obtain their mortgage is because the one credit agency has given an incorrect report to the lender pertaining to their credit.

Please discuss this matter with your client and advise me if the contract can be saved under these circumstances. Thank you.

113.    Thereafter, Mr. Tice contacted Mr. Johnson and informed him that the seller had found another buyer who had already been pre-approved and underwritten for the purchase of the Manville property.

**Mr. and Mrs. Pang's Second Attempt to Obtain Credit for a Mortgage Loan in April 2019**

114.     Feeling down but not out, and determined to get out of their current living situation, Mr. and Mrs. Pang found a new realtor and decided to start the entire process all over again.

115.     In or about early April 2019, Mr. and Mrs. Pang once again began looking at homes in the greater Middlesex, New Jersey area.

116.     In or about mid-April 2019, Mr. and Mrs. Pang found a home for sale in Middlesex, New Jersey ("the Middlesex property") that suited their needs.

117.     The Middlesex property was listed for sale at $247,000.00, and they were unable to negotiate the price down.

118.     In or about late April 2019, Mr. and Mrs. Pang began working with GMH Mortgage Services, LLC ("GMH Mortgage") in Conshohocken, Pennsylvania to obtain financing for a home mortgage loan on the Middlesex property.

119.     In or around late April 2019, Mr. Pang received correspondence titled Notice To The Home Loan Application: Credit Score Information Disclosure from GMH Mortgage Services LLC. The correspondence stated, among other things, that "[i]n connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit scores." This document, which was created on April 26, 2019, included the following information about Mr. Pang's credit scores:

> Applicant: PANG, TYLER
> Name of Score: EXPERIAN/FAIR, ISAAC (VER. 2)
> Credit Score: 0698     Range: 300 to 850

Key Factors effecting the score:
- LEVEL OF DELINQUENCY ON ACCOUNTS
- TOO MANY INQUIRES LAST 12 MONTHS
- LENGTH OF TIME ACCOUNTS HAVE BEEN ESTABLISHED

Applicant: PANG, TYLER
Name of Score: TRANSUNION/FICO CLASSIC (04)
Credit Score: **N/A**     Range: 309 to 839
Key Factors effecting the score:
- **FILE NOT SCORED BECAUSE SUBJECT IS DECEASED**

Applicant: PANG, TYLER
Name of Score: EQUIFAX/FICO CLASSIC V5 FACTA
Credit Score: 00687   Range: 334 to 818
Key Factors effecting the score:
- LEVEL OF DELINQUENCY ON ACCOUNTS
- TIME SINCE DELINQUENCY IS TOO RECENT OR UNKNOWN
- TOO MANY INQUIRES LAST 12 MONTHS
- NUMBER OF ESTABLISHED ACCOUNTS

(emphasis added).

120.    Mr. Pang was excited to make his first home purchase but his excitement was suddenly and unexpectedly stymied when he received a telephone call from GMH Mortgage stating that there was a "problem" with Mr. Pang's credit.

121.    Much to Mr. Pang's shock and dismay, his financing was halted by GMH Mortgage because Mr. Pang's Trans Union credit report indicated that he was "deceased" and had no credit score.

122.    Mr. Pang immediately explained to the loan officers at GMH Mortgage that Trans Union's "deceased" notation had been a continuing problem for many years now and that he had recently sent a very detailed written dispute with supporting documentation to Trans Union on March 21, 2019. Mr. Pang pleaded with the loan officers to be patient with him while he waited for Trans Union to reinvestigate his dispute and delete the "deceased" notation from his Trans Union credit report. Mr. Pang promised the loan officers at GMH Mortgage that he would get back to them as soon as he had an update from Trans Union.

22

123.    Mr. Pang was frustrated, confused, and angry that this obviously false information remained linked to him despite his previous disputes, and that it continued to prevent him from benefiting from his good credit and obtaining new credit. But Mr. Pang also understood that he had little choice but to dispute the information again.

124.    While Mr. Pang wanted to remain hopeful that the matter would be corrected quickly, he also lacked trust that Trans Union would do anything different this time around. Nevertheless, Mr. Pang understood that he was at the complete mercy of Trans Unions' systems to do the right and correct thing.

### Mr. Pang's Third Telephonic Dispute with Trans Union in May 2019

125.    Mr. Pang was now at his wit's end. Why was this happening? And what on Earth was he supposed to do to end the repeated reporting of objectively false and highly damaging information? Mr. Pang experienced a myriad of emotions as the reality set in that there was nothing else that he could do at this point but to continue trying to dispute with Trans Union.

126.    On or about May 9, 2019, after having no luck with his three previous written disputes, Mr. Pang telephoned Trans Union to follow-up on his March dispute and submit another dispute over the phone. He was initially connected to a Trans Union representative name Glen Almeda ("Mr. Almeda"). Mr. Pang explained his issue in great detail to Mr. Almeda and requested that he communicate with someone at Trans Union to have the error corrected immediately. Mr. Almeda stated that there was nothing he could do personally, but said that he could transfer Mr. Pang to a representative in Trans Union's Fraud Department named Christina Kane ("Ms. Kane"). After again explaining his issue in great detail to Ms. Kane, and asking for an update on the status of his three dispute letters, she informed him that her computer system did not indicate that there were any updates. Ms. Kane then transferred him to a representative in the United States named

Julie Smith ("Ms. Smith"). After allegedly looking up Mr. Pang's case file in her computer system, Ms. Smith told Mr. Pang to send all of the documentation he previously sent on three different occasions to Trans Union's Consumer Solutions Department in Chester, Pennsylvania. Mr. Pang stated that he had already mailed all of the requested documentation to Trans Union's Chester, Pennsylvania address on three different occasions. Ms. Smith then stated that she located Mr. Pang's documents in her computer system, which were forwarded to Trans Union's Maintenance Office, and that the Maintenance Office now had five business days to open and review the documents. Thereafter, Ms. Smith stated that Trans Union would send him a copy of his credit report within twelve business days.

127.   Trans Union failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Mr. Pang.

128.   Trans Union failed to heed Mr. Pang's actual notice of the erroneous "deceased" notation and continued to report him as deceased.

129.   As a result of the "deceased" annotation, Defendants made it practically impossible for Mr. Pang to obtain credit.

130.   Mr. Pang is at a complete loss as to what else he could have done. He also believes that absent litigation, the false information will never be removed from his Trans Union credit report.

131.   At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

132.     At all times pertinent hereto, the conduct of the Defendants, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Mr. Pang herein.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim For Relief Against Trans Union and CoreLogic)

133.     Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-132 as if fully stated herein.

134.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

135.     On numerous occasions, Trans Union prepared a patently false consumer report concerning Plaintiff.

136.     On at least one occasion, Defendant CoreLogic assembled, merged, and resold a patently false consumer report concerning Plaintiff.

137.     Despite actual and implied knowledge that Plaintiff is not dead, Defendants readily sold such false reports to one or more third party, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

138.     Defendants Trans Union and CoreLogic violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintains concerning Plaintiff.

139.     As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; the expenditure of time

and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

140.    Defendants' conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

141.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

<div style="text-align: center;">

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform Reasonable Reinvestigation**
**(Second Claim For Relief Against Trans Union)**

</div>

142.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-132 as if fully stated herein.

143.    The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limitation for the completion of such an investigation. *Id.*

144.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact, inaccurate, or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

145.    On multiple occasions between the years of 2017 and 2019, Plaintiff initiated written and telephonic disputes with Defendant Trans Union that it correct and/or delete a specific

item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, references to him being "deceased."

146.    Either Trans Union conducted *no* investigation of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

147.    Defendant Trans Union violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notice of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

148.    As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

149.    Defendant Trans Union's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

150.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)      Determining that Defendants, jointly and severally, negligently and/or willfully violated the FCRA;

b)      Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)      Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)      Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

151.    Plaintiff demands a trial by jury.


Dated: June 17, 2019

<div style="margin-left:40%">

/s/ Jacob M. Polakoff
Jacob M. Polakoff, Bar No. 035832006
jpolakoff@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel. 215.875.3000
Fax 215.875.4604


Hans W. Lodge*
hlodge@bm.net
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 607-7794
Fax: (612) 584-4470

</div>

*pro hac vice* forthcoming

*ATTORNEY FOR PLAINTIFF*